UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

EVAN RHODES,

                     Plaintiff,           Civil No.

    vs.

NEW YORK PRESBYTERIAN HOSPITAL,
ROYAL CHARTER PROPERTIES, INC.,
STEVEN J. CORWIN, M.D., JEAN AMIE,
KATHLEEN HOCHUL, individually and in       **VERIFIED COMPLAINT**
her official capacity as Governor of the State of     **AND JURY DEMAND**
New York, JAMES V. McDONALD, in his
official capacity as Acting Commissioner of
the New York Department of Health and
JOHN DOES 1-20, said names being fictitious,

                     Defendants.

------------------------------------------------------

Plaintiff, EVAN RHODES ("Mr. Rhodes"), by and through his attorneys, Murray-Nolan

Berutti LLC, with knowledge as to his own acts, and upon information and belief as to all others,

hereby complaints of the defendants as follows:

**INTRODUCTION**

1.     Mr. Rhodes was a front-line worker at New York Presbyterian Hospital during the

COVID-19 pandemic. He had been an employee of defendant New York Presbyterian Hospital

("NYPH") for over twenty-six (26) years and lived in NYPH housing which was owned by NYPH

affiliate Royal Charter Properties, Inc. ("Royal").

2.     Mr. Rhodes is a devout Catholic male who is black and over 40 years of age. He

also has a history of suffering with anaphylaxis from taking flu vaccines. He served NYPH and

the community nobly during the pandemic.

3.     However, NYPH determined that it would push to have all of its employees

vaccinated, regardless of their medical or religious objections. Further, in pushing such policy,

defendant's Chief Executive Officer, Steven Corwin, admitted that the policy was race based, at

1

least in part, because most of those who remained unvaccinated were African-Americans, who Corwin noted were as a community much more reluctant than others to become vaccinated. Regardless, Mr. Corwin determined that the objections to the COVID-19 vaccines by "people of color" were not entitled to actual consideration and, thus, deprive "people of color" who objected to the vaccines, including Mr. Rhodes, of serious consideration of their exemption requests and of their objections to the vaccine.

4.      Mr. Rhodes submitted several medical exemption letters from his treating Medical Doctors, and also applied for a religious exemption. Although they were initially granted, Mr. Rhodes faced a hostile work environment related to his status, ultimately leading to his exemptions being withdrawn. Defendants have now constructively terminated him by denying him access to the workplace, stopping salary payments and now, threatening to have him removed from his housing, all of which is part and parcel of defendants' discriminatory and otherwise illegal efforts.

5.      Mr. Rhodes filed a Charge of Discrimination and has received a Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"). Thus, he now brings this action to vindicate his rights.

## JURISDICTION AND VENUE

6.      This is a civil rights and employment law action pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e), and this court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

7.      Venue is proper in this judicial district as defendants reside, are domiciled, and have their principal place of business in New York County, New York, and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

8.      Mr. Rhodes is domiciled New York County, New York.

9.     Defendant NYPH is located and domiciled in New York County, New York, with an address of 5141 Broadway, New York, New York.

10.     Defendant Royal is domiciled in New York County, New York, with an address of. 405 E 71ST St New York, New York.

11.     Defendant Steven J. Corwin, M.D. ("Corwin") is domiciled in New York County, New York, and maintains an address of 525 E. 68th St. Payson 123, New York, New York.

12.     Defendant Jean Amie ("Amie") is, upon information and belief, domiciled in New York County, New York.

13.     Defendant Kathy Hochul ("Governor Hochul") is an individual domiciled in Albany County, New York, and was at all relevant times the Governor of the State of New York who, as the State's chief executive, is responsible for the execution of its laws and regulations, including the challenged vaccine mandate, and for the approval of all executive branch policies and directives. At all pertinent times Governor Hochul has acted and will act individually and under color of state law in promulgating official State policy and enforcing the same, which policy included her personal views on religion, thus constituting an attempted establishment of religion. Defendant Hochul's principal place of business is located at the State Capitol Building, Albany, New York. She is sued in her official capacity.

14.     Defendant James V. McDonald ("McDonald") is the Acting Commissioner of the New York State Department of Health (DOH) and is the agency representative responsible for promulgation and enforcement of the challenged vaccine mandate, and is domiciled in Albany County, New York. At all pertinent times McDonald, and his predecessor Howard A. Zucker (Zucker), has acted and will act under color of state law executing official state policy. Defendant McDonald's principal place of business is located at 3959 Broadway, New York, NY 10032. He is sued in his official capacity.

3

15.    Defendants John Does 1-20 is a fictitious name for individuals who aided in, abetted, conspired, assisted and/or otherwise acted to cause the violations of Mr. Rhodes' rights as set forth herein.

## FACTS COMMON AS TO ALL CAUSES OF ACTION

### A.    General Background.

16.    Mr. Rhodes commenced his employment at NYPH on November 11, 1996, as a pharmacy technician.

17.    Commencing in or about 1998, Mr. Rhodes began working in administrative services within the Radiology Department where he continued to work until July 21, 2022, and was placed on unpaid leave on May 26, 2023. In the interim period, NYPH applied Mr. Rhodes' accumulated sick time and paid time off ("PTO") through April 2023, when it ran out.

18.    Throughout his tenure at NYPH, Mr. Rhodes was an excellent employee who routinely received annual evaluations assessing him as having exceeded expectations.

19.    Mr. Rhodes worked throughout the pandemic, serving as one of the heroes of the time who risked his own health and well-being to help keep the hospital open when most of the world was shut down.

20.    Mr. Rhodes was perhaps NYPH's best employee. He lived across the street in an apartment available to him as an employee of NYPH which is affiliated with Royal. Upon information and belief, Royal is a not-for-profit holding company of some or all NYPH real estate assets.

21.    Due to Mr. Rhodes' close proximity to NYPH, and his excellent work ethic, he was tremendously reliable. Mr. Rhodes' value to NYPH was reflected in the fact that he was one of the very few employees in the entire facility who was allowed to work in multiple departments, and the only such employee in the Radiology Department Thus, he was paid from multiple differed

4

cost centers simultaneously such that his job title never reflected the vastness of his actual responsibilities.

22.     Further, prior to contracting COVID-19 in December 2021, Mr. Rhodes had not called out sick for about 8 years and had almost 1,000 hours of sick time accrued when in July 2022, he was precluded from returning to work due to his refusal to get a COVID-19 shot.

**B.     The Mandate.**

23.     On June 11, 2021, NYPH notified Mr. Rhodes via email that all employees were required to receive the COVID-19 vaccine by September 1, 2021, or obtain a valid exemption due to medical reasons, pregnancy, or religious reasons.

24.     Following issuance of the June 11, 2021, email, NYPH Security Guards had a list of all people who were not then in compliance with the vaccine mandate, in violation of his rights to medical privacy.

25.     As of June 11, 2021, when the mandate was announced, NYPH treated Mr. Rhodes as if his entire career at NYPH had been meaningless. Mr. Rhodes years of valuable service, his diligence, his reliability, his work ethic, and his outstanding history of evaluations whereby he exceeded expectations was of no importance as compared to his vaccination status.

26.     Upon information and belief, NYPH was motivated by federal and/or state money in attempting to compel as many employees as possible to get vaccinated, as opposed to the viability of the vaccines themselves. Those standing in the way of such funding, such as Mr. Rhodes, became expendable.

27.     At the time that NYPH mandated its vaccine mandate, it knew that such mandate would have a significant disparate impact on African-American employees, since African-Americans were far less likely to become vaccinated than other racial and ethnic groups.

28.    Moreover, all COVID-19 vaccines and COVID-19 tests were only available because they had been provided Emergency Use Authority ("EUA") pursuant to the 21 U.S.C. § 300bbb4(e)(1)(A)(ii)(III)., which requires informed consent of those being offered the vaccine, the refusal of which cannot be punished pursuant to the federal informed consent regulation, 45 CFR §45.116(b)(8).

29.    As an actual or implied right of employment, and as a matter of public policy, NYPH was not permitted to compel employees to waive their rights to informed consent as a condition of employment.

30.    Moreover, NYPH being a hospital, it was fully aware of the professional responsibility it had, above and beyond public policy and employment rights, to ensure that all individual taking any pharmacological agent, including all vaccines, only do so with informed consent.

31.    Despite knowing that the mandate would have a disparate impact on African-Americans, and despite knowing that no person can be compelled to waive his or her rights to informed consent when ingesting a pharmacological agent, particularly one which has not been fully approved following the normal strict Food and Drug Administration protocols, NYPH malevolently issued the vaccine mandate for its employees nonetheless in whole or in part because, NYPH received substantial federal and/or state government remuneration for having a workforce which was highly vaccinated with the COVID-19 shots, such that NYPH stood to gain by compelling reticent African-American employees to be forced to choose between their informed consent right to decline the vaccine or to lose their jobs.

32.    Defendant Corwin was the primary instigator of the employee mandate and knew that the NYPH mandate was disparately impacting minorities at the time it was promulgated, as

he later would admit in at least one television interview, such that the mandate was known by defend not truly to be one of neutral application when it was made.

### C.    <u>Workplace Harassment and Discrimination against Mr. Rhodes and Others.</u>

33.    Once the mandate was announced and Mr. Rhodes was on "the list" of the non-compliant, which was heavily skewed towards African-American employees such as Mr. Rhodes, he began suffering discrimination from supervisors and managers.

34.    The newly appointed Director of the Department of Radiology, defendant Amie, approached Mr. Rhodes while he was working at the vaccination site and asked how Mr. Rhodes was allowed to work at the site when he was not vaccinated. The only way Amie could know Mr. Rhodes' vaccination status was from the list, and such inquiry demonstrated a discriminatory animus toward Mr. Rhodes based on his health status.

35.    Moreover, Mr. Rhodes was advised by two co-workers, both of whom were black Americans, who served as morning Patient Registrars that Amie approached them to find out why they were not vaccinated, since "all the Jews are taking it," thus implying that as black Christians, they had no reason for not taking the vaccine since Jews were taking it, and minimizing their religious beliefs.

36.    Another co-worker told Mr. Rhodes that Amie threatened to jab the vaccine into her arm. She later resigned her position, about two weeks after the incident.

37.    Mr. Rhodes also heard that Dr. Min, the head of the entire Radiology group at Cornell (the parent company of NYPH), was reported to have said that he would not accept anything less than 100% compliance with the vaccine mandate.

38.    Amie went to each employee in the department and asked them their vaccination status, which had the effect of intimidating unvaccinated employees based on their health status.

Amie would also routinely took people to Workforce Safety to be vaccinated and would offer them movie tickets in order to get vaccinated.

39.    Moreover, Amie reputedly had a history of terminating older, more expensive employees in favor of younger employees and members of his family.

40.    As a way to pressure, humiliate, and retaliate against Mr. Rhodes, Amie instructed supervisors not to call Mr. Rhodes, or to call him last, and also to try working without him even though Mr. Rhodes was willing to come in and help. Some Supervisors were reprimanded for calling Mr. Rhodes in to help with overtime.

**D.    Mr. Rhodes' Medical Condition, Religious Objection, and His Reasonable Fear of the Vaccine.**

41.    Mr. Rhodes had a history of Anaphylaxis resulting from receiving flu shots. On two occasions he had serious near-death experiences with anaphylaxis and had not received another flu shot since 2015, after the shot caused his throat to close. Anaphylaxis is known to present a risk of death to an individual who is stricken by it if treatment is not immediately rendered. (*see* (https://www.mayoclinic.org/diseases-conditions/anaphylaxis/symptoms-causes/syc-20351468).

42.    Further, during the course of his employment during the pandemic, Mr. Rhodes saw several people die from what were evidently vaccine-related injuries including, without limitation, an Emergency Room doctor who took the vaccine and died the same night, and a friend who died shortly after receiving the vaccine.

43.    Combined with his history of Anaphylaxis, a known side effect of COVID-19 vaccines (*see* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html), Mr. Rhodes' knowledge about vaccine injuries and deaths placed him in reasonable and great fear of the vaccine, such that the vaccine mandate caused Mr. Rhodes to suffer with panic attacks.

44.    Since Anaphylaxis is potentially deadly and was a known side effect of the COVID-19 EUA vaccines, on July 21, 2021, Mr. Rhodes submitted a medical exemption letter signed by

his primary care physician. John Eck, M.D., asserting that Mr. Rhodes should not receive the COVID-19 shot.

45.     At all relevant times, Mr. Rhodes was and is a baptized, confirmed, devout and practicing Roman Catholic. Thus, when Mr. Rhodes applied for a medical exemption, he simultaneously applied for a religious exemption as a devout Catholic whose religious sensibilities prevented him from receiving a COVID-19 shot.

**E.    Mr. Rhodes' Medical and Religious Exemptions.**

46.     On August 12, 2021, without ever speaking with Mr. Rhodes' physician, NYPH denied Mr. Rhodes' request for a medical exemption.

47.     In light of the potential deadly nature of the vaccine to Mr. Rhodes, he suffered extreme emotional distress from such improper denial, which already was occurring due to the discrimination he was suffering.

48.     Following receipt of the denial, Mr. Rhodes spoke with the NYPH "VaxApp" representative over the phone. The representative told Mr. Rhodes that he could appeal the medical exemption denial because NYPH failed to have a verbal conversation with his physician, which is standard protocol.

49.     The VaxApp representative also told Mr. Rhodes that since the medical exemption was denied, he could also file for a religious exemption, to which  Mr. Rhodes replied that he had already submitted a religious exemption request, which had not been considered.

50.     As a result, the VaxApp representative submitted an appeal from the denial of the medical exemption and also submitted Mr. Rhodes' religious exemption request for him on that same day.

51.     On August 24, 2021, Mr. Rhodes received an update advising him that his medical exemption was approved. On the same day, Mr. Rhodes received a separate email advising that his religious exemption was approved.

52.     Mr. Rhodes confirmed with a VaxApp representative over the telephoned that he was indeed approved for both the religious and medical exemptions. He also saw his name on the medical and religious exemptions lists, which list were reviewed on a weekly basis by Workplace Safety staff in his presence.

53.     From that time, Mr. Rhodes continued to perform his regular work duties at NYPH, utilizing the accommodation of weekly testing in lieu of being vaccinated, although COVID-19 tests were only available due to their receiving EUA approval from the FDA.

54.     Every time that Mr. Rhodes went in for weekly testing, he confirmed that his name was on the medical and religious exemptions lists. After the religious exemption list was removed as a result of the New York Department of Health decision to remove religious exemptions for healthcare workers, his name continued to be on the list of employees approved for medical exemptions.

F.      **Mr. Rhodes' Emotional Distress.**

55.     Mr. Rhodes experienced panic attacks and other emotional damage which was adversely affecting his health as a direct and proximate result of the institution of the COVID-19 vaccine mandate and defendants' misconduct toward him and others thereafter.

56.     On November 1, 2021, on the advice of a hospital nurse, Mr. Rhodes checked into the Emergency Room at NYPH after feeling jittery and complaining of hypertension while getting his COVID-19 swab. Mr. Rhodes' blood pressure measured 106/202 when he checked into the ER.

57.    Later in December 2021, Mr. Rhodes tested positive for the SARS-CoV-2 virus and became ill with COVID-19. Upon recovery, Mr. Rhodes had a positive antibody test which demonstrated natural immunity.

58.    At such time, significant peer reviewed studies existed which demonstrated that individuals with natural immunity were better protected against COVID-19 than those being vaccinated. Despite the same, Mr. Rhodes continued having to take COVID-19 tests.

59.    On December 24, 2021, again at the behest of a nurse at work, Mr. Rhodes again admitted himself to the Room with fatigue, stress, and depression symptoms.

60.    Mr. Rhodes would again check himself into the ER with workplace related distress on July 22, 2022, and again at the behest of a nurse.

**G.    Defendants Reverse Course and Remove Mr. Rhodes' Exemptions.**

61.    On January 7, 2022, Mr. Rhodes received a medical exemption for the flu shot.

62.    In April 2022, about 8 months after the approval of his medical exemption, NYPH informed Mr. Rhodes that he would need to re-submit his request for a COVID-19 medical exemption, including various forms. Mr. Rhodes submitted all of the documentation that he was requested to provide.

63.    On July 21, 2022, NYPH denied Mr. Rhodes a medical exemption, based on review of an unidentified "medical clinician panel," which consists of individuals identified herein as John Doe defendants. Such denial was issued despite the fact that Mr. Rhodes had provided three separate doctors notes confirming that Mr. Rhodes should not receive the COVID-19 vaccine.

64.    The first medical exemption that Mr. Rhodes provided to NYPH was from his primary care physician John Eck, M.D., dated July 21, 2021.  Dr. Eck noted that Mr. Rhodes has a contraindication to the COVID-19 vaccine in light of a history of reactions to influenza vaccines that required urgent care due to Anaphylaxis.

11

65.     The second medical exemption that Mr. Rhodes provided to NYPH was from his primary care physician Alieta Eck, M.D., dated May 13, 2022. The second medical exemption cited Mr. Rhodes' prior anaphylactic reactions as reason to never get the flu vaccine again, and due to the similarity in ingredients, Dr. Eck advised not to get the COVID-19 vaccine either. Further, Dr. Eck opined that Mr. Rhodes fits many of the criteria for mast cell activation syndrome whereby his body has a strong adverse reaction to many environmental or ingested substances. Finally, Dr. Eck indicated that she was medically concerned that Mr. Rhodes could have an adverse reaction to the vaccine given his elevated antibody levels.

66.     Following receipt of the first and second medical exemptions, followed by the subsequent declination of the medical exemption that already had been granted, NYPH advised Mr. Rhodes he should obtain an exemption from an allergist. While NYPH recommended that Mr. Rhodes go to an NYPH affiliated allergist, Mr. Rhodes instead chose to go to an unbiased allergist who was unaffiliated with NYPH, Dr. Martin Dubravec.

67.     On June 27, 2022, Dr. Dubravec conducted a telehealth visit with Mr. Rhodes, reviewed his medical history, symptoms, and severe reactivity to vaccination. Dr. Dubravec found that Mr. Rhodes should not receive any COVID-19 vaccinations.

68.     In a letter attached to the NYPH medical exemption form, Dr. Dubravec provided an overview of Mr. Rhodes' medical history and opined that due to Mr. Rhodes' history of anaphylaxis as well as his high level of COVID-19 antibodies, Mr. Rhodes was at 2 to 3 times increased risk of reactivity to COVID-19 vaccination.

69.     On July 21, 2022, Mr. Rhodes was informed by NYPH via email that his request for a medical exemption was denied.  The denial was as follows:

> *After careful review of your supplemental submission in support of your medical exemption request and relevant medical guidance, including CDC criteria for COVID-19 vaccine medical contraindications, we regret to inform you that your request for medical exemption from the COVID-19 vaccine has been denied. The*

*exemption request and your supplemental submission in support of that exemption request were reviewed and decided by the medical clinician panel.*

*You are required to receive at least one dose of the COVID-19 vaccine within 7 days of the date of this notice. You may do so either at Workforce Health & Safety or outside of NYP. If you decide to get vaccinated outside of NYP, you need to upload a copy of your vaccination documentation to VaxApp within 7 days of the date of this notice. Your documentation must include your name and date of birth, the manufacturer of the vaccine, and the date(s) of vaccination. If you are receiving your first dose of a two-dose vaccine, you must receive your second dose within the manufacturer's prescribed timeframe.*

70.    Upon information and belief, Corwin and/or John Doe defendants, partly or exclusively due to financial consideration related to federal and/or state funding, selected the members of the "medical clinician panel" because they were unlikely to grant medical exemptions.

71.    Upon information and belief, the "medical clinician panel" never spoke with any of the treating physicians who provided medical exemption letter to Mr. Rhodes.

72.    Upon information and belief, the "medical clinician panel" never sought to obtain Mr. Rhodes' official medical health records which supported the medical exemptions.

73.    Upon information and belief, the "medical clinician panel" reviewed the medical exemption request with the intent at the outset to deny it if at all possible.

74.    Upon information and belief, Corwin, and/or Amie, and/or John Does 1-20 were invested in one or more of Pfizer, Moderna, and Johnson & Johnson such that compulsory vaccination of NYPH employees was in their financial interests, even if the employees were not appropriate candidates for the EUA vaccines.

75.    Further, if Mr. Rhodes did not get a COVID-19 shot after the medical exemption was denied, he faced potential removal from his apartment by Royal, which was additional bad faith leverage defendants utilized to pressure Mr. Rhodes to forswear the advice of his personal physicians and risk safety to his life for the benefit of defendants.

76. <u>By their conduct, defendant acted</u> purposely or recklessly, causing the victim emotional distress so severe that it could be expected to adversely affect mental health.

77. Defendants conducted themselves in bad faith, making a mockery of the medical exemption process, which conduct was extreme and outrageous and intolerable in a civilized society.

78. Such conduct was undertaken by defendants purposely or with reckless disregard for the safety and well being of Mr. Rhodes and others who were similarly situated and was so severe that it reasonably could be expected that Mr. Rhodes' mental health would be adversely affected.

79. On July 21, 2022, Mr. Rhodes' religious exemption was also denied.

**H.    <u>Reasonable Accommodations Existed But Were Not Offered to Mr. Rhodes.</u>**

80. Defendants offered no religious accommodation at all to Mr. Rhodes, much less one which was reasonable, although accommodations could have been made which were reasonable and which would not result in substantial increased costs in relation to the conduct of defendants' particular business, in violation of Title VII of the Civil Rights Act of 1964. *See Groff v. DeJoy*, 2023 U.S. LEXIS 2790, *32

81. Moreover, having permitted Mr. Rhodes to work at NYPH for almost a year with both medical and religious exemptions, defendants should be estopped from claiming that Mr. Rhodes' medical and religious issues could not be reasonably accommodated.

82. While Mr. Rhodes' title is "Patient Registrar," his duties have not required direct patient contact and he was isolated in his office. Mr. Rhodes' interactions with patients only occurred when he was volunteering or working overtime in other departments outside of his own workspace, or at the vaccine offsite location. Mr. Rhodes' volunteering, which was an extension

of his dedication and outstanding work for NYPH, occurred between February 2021 and May 2021, and January 2022 and July 2022.

83.     In summer of 2020 Mr. Rhodes was moved to an isolated office where he performed duties such as monitoring radiological statistics, corresponding with physicians and nurses regarding radiological procedures, guiding physicians/PAs in correctly ordering radiology exams, canceling exams for physicians, monitoring radiological technicians procedures and making sure they were done in a timely fashion, and more. Many of the tasks that Mr. Rhodes performed are normally done by radiology supervisors, however it routinely passed on to Mr. Rhodes due to a gross lack of general staff and management.

84.     On July 22, 2022, Mr. Rhodes again reported to the ER arising from, without limitation, ongoing lightheadedness and dizziness caused by workplace stress.

85.     On July 22, 2022, Mr. Rhodes applied for a medical leave of absence. His application for short term disability was denied on August 22, 2022, because the short term disability insurance carrier determined that Mr. Rhodes' health problems were caused by workplace conditions, such that they fell under Workers' Compensation Insurance.

86.     In response to NYPH's denial of his request for a medical exemption, on July 27, 2022, Mr. Rhodes filed the Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Mr. Rhodes later retained legal counsel and filed an updated Charge of Discrimination.

I.    **Evidence of Racial Animus and Intentional Discrimination.**

87.     On July 28, 2022, Mr. Rhodes went to Workforce Safety to get cleared to go back to work. Rather than receiving such clearance, Mr. Rhodes suffered the humiliating indignity, of being escorted out of the building by two security guards. The incident also caused Mr. Rhodes to have a reasonable fear for his personal safety, as it occurred during a time of heightened awareness

nationally about the trauma faced, most particularly by African American males in relation their interactions with police personnel and/or similar authority figures.

88.    Indeed, Corwin engineered the NYPH vaccine mandate as a way of eliminating primarily black hospital employees and, upon information and belief, delighted in having Mr. Rhodes removed from the premises by security personnel due to his continued refusal as a black American to take the COVID-19 vaccine.

89.    Indeed, in an interview with Fox News on June 16, 2021, Corwin stated that by September 1, 2021, "we've got to have everyone vaccinated." He also said that NYPH has 48,000 employees and that about 30% of those employees had not been vaccinated. Corwin continued that the number was too high that he would spend the next couple of months having NYPH "continuing to educate people." Corwin then asserted that by September 1st "everyone that is not vaccinated will have a progressive process and employees 'will have to leave'" if not vaccinated.

90.    Thus, when Mr. Rhodes was granted his medical and religious exemptions in August 2021, it was already Corwin's intent to find a way to compel Mr. Rhodes and those similarly situated to become vaccinated anyway.

91.    Corwin continued in his interview that NYPH's low vaccination rates were because 60% of the employees are "people of color, so people of color have suspicions around the vaccine…" He said that "…the vaccine has been proven to be very safe… so we have to educate… we have to overcome that hesitancy, but I think by September 1st we will have spent enough time trying to overcome that…"

92.    Corwin's vaccination policy was, thus, specifically aimed at "people of color" like Mr. Rhodes.

93.    In his religious exemption letter which originally had been granted, Mr. Rhodes pointed out that the vaccines had been proven not to be as effective or safe as originally believed,

16

and that they did not stop individuals from spreading or contracting the Sars-CoV-2 virus, which sometimes causes COVID-19, such that the mandate itself was irrational. In accepting Mr. Rhodes religious exemption containing such facts, defendant accepted such facts and true and never challenged them since, in fact, defendants were aware that they were true.

94.    Corwin's statements demonstrate an unmistakable bias against African American employees who are "vaccine hesitant." The subject interview is incorporated herein by reference, and can be found here, https://www.fox5ny.com/video/944839.

95.    In keeping with Corwin's statements, Mr. Rhodes was aware that Amie bragged to staff members several times that NYPH was not concerned about their employees filing lawsuits because that had hired the "biggest and nastiest" law firm (Paul Weiss) to block all lawsuits, and help reject all medical exemptions. Their goal was and remains to reject all exemptions so that they can achieve 100% employee vaccination status.

96.    To the best of Mr. Rhodes' knowledge, the majority of NYPH employees who resigned or were terminated for non-compliance with the vaccine mandate were people of color.

**J.    Age discrimination.**

97.    Mr. Rhodes also has been an employee of NYPH for over 26 years, and being born on November 13, 1971, was over 50 years old when he was separated from his employment with NYPH.

98.    Mr. Rhodes' salary was significantly higher than the salaries of younger and less experienced employees.  NYPH is seeking to terminate Mr. Rhodes without cause and without compensation or severance, and its affiliate, Royal, is threatening the termination of Mr. Rhodes' housing as a result of his being on leave.

99.    Mr. Rhodes was on paid leave while he utilized his accumulated time off, without his consent. However, NYPH has asserted that if the workers' compensation claim is denied, Mr.

Rhodes will be viewed as having "resigned," and he will have to leave his apartment which has been his home for over 20 years, with only 30 days' notice.

100.    Upon information and belief, defendants' actions in seeking to terminate Mr. Rhodes without offering him any accommodation, was in whole or in part motivated by Mr. Rhodes' age.

101.    Upon information and belief, Mr. Rhodes has been replaced in his position by one or more younger, less expensive workers.

### K.    Mr. Rhodes has been diagnosed with Post Traumatic Stress Disorder and Panic Disorder due at least in part to the Vaccine Mandate.

102.    In April 2020, Mr. Rhodes began experiencing symptoms of post-traumatic stress disorder ("PTSD") and increased throughout that year as he was confronted with an increased workload and seeing coworkers die. Mr. Rhodes' symptoms increased with the advent of the vaccine mandate. On August 26, 2022, Mr. Rhodes consulted again with his primary care physician, Dr. Alieta Eck, due to his stress, anxiety, and depression. Dr. Eck diagnosed Mr. Rhodes as suffering from anxiety and Post Traumatic Stress Disorder ("PTSD").

103.    Other medical practitioners who have examined Mr. Rhodes have found him to be suffering with Panic Disorder caused by the vaccine mandate.

104.    As an individual that has a history of anaphylaxis and other allergic reactions, that suffers from anxiety, depress, panic attacks, heart palpitations, and PTSD, it is unreasonable to require Mr. Rhodes to undergo a medical procedure (COVID-19 vaccine) that could seriously injure or kill him.

105.    In *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38-39 (1905) (emphasis added), which has been used by many courts during the pandemic to uphold vaccine mandates, the United States Supreme Court noted as to individuals whose health provably may be at risk from a mandated vaccine:

It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body, would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned.

106. Even under a generous application of *Jacobson* to this matter, Mr. Rhodes is an individual with a demonstrated reason to believe that COVID-19 vaccination would be "cruel and inhuman to the last degree" to himself given "a particular condition of his health or body," such that under no circumstance, may he be required to be injected with a COVID-19 shot which is known to induce Anaphylaxis as a side effect and risk.

107. As a result of Mr. Rhodes being an obvious candidate for an exemption even under a generous reading of *Jacobson*, by vacating Mr. Rhodes' medical and religious exemptions, putting him through the emotional trauma of having to re-file his requests for medical and religious exemptions, and then denying his medical and religious exemptions, all while harassing and discriminating against him, defendants acted in a manner so cruel and lawless as to be worthy of nothing but opprobrium, scorn, and contempt.

**L    The State of New York Imposed Vaccine & Testing Mandate.**

108. Upon information and belief, defendants will contend that they were obligated to deny Mr. Rhodes' religious exemption due to a change in regulations by Governor Hochul and the New York Department of Health.

109. Defendants never had to rescind the original religious exemption due to any regulation, such that any argument by defendants concerning an obligation to withdraw the religious exemption approval is false and accommodating Mr. Rhodes' religious objections was not an undue hardship.

110.    Further, NYPH still had options available to provide Mr. Rhodes with a religious exemption after the change in regulations but chose not to accommodate Mr. Rhodes, contrary to law.

111.    However, and regardless, the revised amendment was unconstitutional. To the extend NYPH, Corwin, Amie, and John Does 1-20 were acting to enforce the subject regulation, they were state actors and are liable for the damage caused to Mr. Rhodes constitutional rights in such regard.

112.    On August 16, 2021, New York State Governor Andrew Cuomo, through regulations issued by the New York Department of Health ("NYDOH"), "Prevention of COVID-19 transmission by covered entities," imposed compulsory purported vaccination against COVID-19 upon all healthcare workers.

113.    The original version of the regulation, 10 NYCCR §2.61 ("the Regulation"), required all hospital healthcare workers to be "fully vaccinated against COVID-19 by September 27, 2021."

114.    On August 18, 2021, NYDOH issued an "Order for Summary Action" that required general hospitals to "continuously require all covered personnel to be fully vaccinated against COVID-19," but allowed for medical exemptions and religious exemptions as follows:

>    Covered entities shall grant a religious exemption for COVID-19 vaccination for covered personnel if they hold a genuine and sincere religious belief contrary to the practice of immunization, subject to a reasonable accommodation by the employer.

115.    Then available COVID-19 vaccines all employed human fetal cell lines derived from procured abortion in testing, development or production thereof. In particular:

- Johnson & Johnson/Janssen: Fetal cell cultures are used to produce and manufacture the J&J COVID-19 vaccine and the final formulation of this vaccine includes residual amounts of the fetal host cell proteins (≤0.15 mcg) and/or host cell DNA (≤3 ng);

- Pfizer/BioNTech: The HEK-293 abortion-related cell line was used in research related to the development of the Pfizer COVID-19 vaccine; and

- Moderna/NIAID: Aborted fetal cell lines were used in both the development and testing of Moderna's COVID-19 vaccine.

116.    The Regulation was issued while Governor Cuomo was still in office and provided two bases for an exemption from the vaccination mandate: (1) medical, and (2) sincerely held religious beliefs.

### M.    Governor Hochul Establishes a Religion and Enlists Employers to Enforce Her Religion.

117.    On August 23, 2021, immediately upon the resignation of Governor Cuomo from office, the New York State Public Health & Health Planning Council ("the Health Council") on a summary basis published a new proposed regulation, 10 NYCCR §2.61, that expanded the vaccination requirement and eliminated the religious exemption that had been in the August 18, 2021, Order.

118.    The removal of the religious exemption was purposeful, it was done because Governor Hochul wanted to discriminate against religious objectors to the vaccines, and it was irrational since the vaccines were not effective against the virus in its then-present form, which was known or should have been known by Governor Hochul

119.    On August 26, 2021, coinciding with the Governor Kathy Hochul taking office following Governor Cuomo's resignation, the NYDOH vacated its original regulation, 10 NYCCR §2.61, upon Governor Hochul's Order and reissued it ("the New Regulation") providing only for a medical exemption and without providing any exemption for sincerely held religious beliefs.

120.    In issuing the New Regulation, the NYDOH offered no explanation for vacating the religious exemption or why a reasonable accommodation provided to medically exempt health care workers was not similarly be extended to healthcare workers or administrative support workers who do not perform healthcare services with sincerely held religious beliefs, such that all

evidence is that the NYDOH acted in such manner out of hostility toward religiously devout persons who held sincere religious beliefs, including Roman Catholics like Mr. Rhodes, who oppose mandatory vaccinations that contain substances employing human fetal cell lines derived from procured abortion in testing, development or production.

121.   Governor Hochul and the NYDOH Regulation effectively targeted sincere and devout Roman Catholics and Christians, including Mr. Rhodes, and any other persons who opposed mandatory COVID-19 vaccines on the basis of sincerely held religious beliefs.  Public statements by Governor Hochul's bear witness to her intent and animus targeting faithful religious opposition to the COVID-19 vaccines.

122.   In public statements, Governor Hochul admitted that the religious exemption was intentionally "left off" the NYDOH's new regulation. When asked why, the Governor answered that there was no "sanctioned religious exemption from any organized religion" and that organized religions are "encouraging the opposite."

123.   Contemplating Roman Catholics who objected to receiving a vaccine and promoting her own religious beliefs, Governor Hochul stated that, "everybody from the Pope on down is encouraging people to get vaccinated."

124.   Speaking to a different audience, Governor Hochul elaborated: "How can you believe that God would give a vaccine that would cause you harm? That is not truth. Those are just lies out there on social media."

125.   The day before the NYDOH vaccination mandate went into effect, Governor Hochul again expressed her own theological belief that religious objections to COVID-19 vaccines are theologically flawed: "All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are."

126.    Governor Hochul went so far in her public remarks as to encourage people to eventually serve as her apostles to persuade others to get vaccinated as if on a religious crusade at her behest. She characterized vaccine-hesitant New Yorkers essentially as heretics who were "not listening to what God wants," and said, "I need you to be my apostles. I need you to go out and talk about it and say, we owe this to each other. We love each other."

127.    By her actions, words, and deeds, Governor Hochul seized the mantle of a new age preacher to proselytize the State of New York's new COVID-19 vaccine religion, which she imposed on New Yorkers affected by the New Regulation as an article of faith in her singular religious righteousness, thus holding herself out as a false God or prophet.

128.    Those health care employees, regardless of their role or contact with patients who, like Mr. Rhodes, refused to abandon their faith, profess allegiance to Governor Hochul's COVID-19 vaccine theology, and submit their will to the State by getting the vaccination, were left jobless and without income.

129.    Such conduct and acts are highly offensive to the Constitution and to millions of Americans.

130.    By virtue of relying on state law, defendants were acting as enforcers of state policy such that they were state actors in such respects.

131.    The NYDOH's decision to vacate the Regulation and issue the New Regulation without a religious exemption, and the defendants' adoption, implementation, and enforcement thereof as state actors without providing exception or accommodations for sincerely held religious beliefs, was arbitrary and capricious, hostile to employees holding sincerely held religious beliefs, and not narrowly tailored to stem the spread of COVID-19.

132.    Defendants, as state actors acting under color of state law, adopted, implemented, and enforced the New Regulation and Governor Hochul's state-imposed religious beliefs and

COVID-19 vaccine theology, and otherwise imposed them upon Mr. Rhodes requiring him, as a condition of employment, to adopt and practice them and essentially to renounce him Roman Catholic faith.

## FIRST COUNT
### (Title VII- Failure to Accommodate)
### (All Defendants Other than the Governor and the Acting Commissioner)

133.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

134.    Mr. Rhodes' exercise of sincerely held religious beliefs is a protected activity under Title VII.

135.    Mr. Rhodes' is protected against discrimination based on his health status under Title Vii.

136.    Defendants were aware that Mr. Rhodes opposed COVID-19 vaccination based upon his sincerely held religious beliefs and his medical condition.

137.    Defendants terminated Mr. Rhodes for declining to receive a COVID-19 vaccination on account of his sincerely held religious beliefs and his medical condition.

138.    No reasonable accommodation was offered to Mr. Rhodes, although such accommodation existed and would not unduly burden defendants' business.

139.    By terminating Mr. Rhodes and refusing him a reasonable accommodation for the same, despite there being opportunities to do so, defendants directly and proximately caused Mr. Rhodes damage, including pecuniary loss and emotional distress with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A. Compensatory damages;

B. Punitive damages;

24

C.  Awarding back pay;

D.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E.  Awarding interest as allowed by law;

F.  Awarding such other and further relief as may be equitable and just.

### SECOND COUND
### (Title VII—Hostile Work Environment/ ADEA/Rehabilitation Act)
### (All Defendants Other than the Governor and the Acting Commissioner)

140.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

141.    By their actions, defendants created an unlawful hostile working environment which was permeated with discriminatory intimidation, ridicule, and insult, leading to constructive termination, that is sufficiently severe or pervasive to alter the conditions of Mr. Rhodes' employment and created an abusive working environment.

142.    Such actions violated law, and directly and proximately caused Mr. Rhodes damages including, without limitation, economic damages and emotional distress.

**WHEREFORE** Mr. Rhodes demands judgment against the defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A.  Compensatory damages;

B.  Punitive damages;

C.  Awarding back pay;

D.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E.  Awarding interest as allowed by law;

F.  Awarding such other and further relief as may be permitted by statute and otherwise are equitable and just.

## THIRD COUNT
### (Title VII--Religious Discrimination)
### (All Defendants Other than the Governor and the Acting Commissioner)

143.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

144.    Defendants' refusal to offer Mr. Rhodes was due in whole or in part to his religious beliefs, of which he advised defendants, and resulted in his termination, actual or constructive.

145.    Defendants had ample opportunity to provide reasonable accommodations to Mr. Rhodes which would not present an undue hardship to NYPH.

146.    Such basis violated law, and directly and proximately caused Mr. Rhodes damages including, without limitation, economic damages and emotional distress.

**WHEREFORE** Mr. Rhodes  demands judgment against the defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

G.  Compensatory damages;

H.  Punitive damages;

I.  Awarding back pay;

J.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

K.  Awarding interest as allowed by law;

L.  Awarding such other and further relief as may be equitable and just.

## FOURTH COUNT
### (New York Human Rights Law - Failure to Accommodate on the Basis of Religion)
### (All Defendants Other than the Governor and the Acting Commissioner)

147.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

148.  Defendants failed to offer Mr. Rhodes any accommodation for his religious beliefs and actually or constructively terminated his employment, in violation of the New York Executive Law, Chap. 18, Art. 15 ("NYHRL"), §296.10.

149.  Defendants had ample opportunity to provide reasonable alternative accommodations to Mr. Rhodes which would not present an undue hardship to NYPH's business. yet reasonable alternatives existed which would not have unduly burdened defendants' business had they been offered to Mr. Rhodes.

150.  Defendants' failure to provide an accommodation resulted in the actual or constructive discharge of Mr. Rhodes from his employment.

151.  As a direct and proximate result of defendants' violations of NYHRL as aforesaid, Mr. Rhodes suffered damages, including pecuniary loss and emotional distress.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A.  Compensatory damages;

B.  Punitive damages;

C.  Awarding back pay;

D.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E.  Awarding interest as allowed by law;

F.  Awarding such other and further relief as may be equitable and just.

### FIFTH COUNT
**(New York State Human Rights Law - Retaliation on the Basis of Religion)**
**(All Defendants Other than the Governor and the Acting Commissioner)**

152.  Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

27

153.    By virtue of the defendants' knowledge that Mr. Rhodes was a Roman Catholic who opposed and refused COVID-19 vaccination based upon his sincerely held religious beliefs, the defendants actually or constructively terminated his employment in retaliation for her beliefs in violation of the NYHRL.

154.    But for Mr. Rhodes assertion of his sincerely held religious beliefs which prohibited him from consenting to COVID-19 vaccination, and had he consented to COVID-19 vaccination in contradiction of his beliefs, defendants would not have terminated her employment, which was retaliation.

155.    Defendants had ample opportunity to provide reasonable accommodations to Mr. Rhodes which would not present an undue hardship to NYPH.

156.    Mr. Rhodes' assertion of his religious beliefs as a Roman Catholic was a direct and proximate cause of his actual or constructive termination of employment by defendants, who thus caused him damages, including pecuniary loss and emotional distress with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against the defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A. Compensatory damages;

B. Punitive damages;

C. Awarding back pay;

D. Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E. Awarding interest as allowed by law;

F. Awarding such other and further relief as may be equitable and just.

**SIXTH COUNT**
**(New York State Human Rights Law – Unlawful Discriminatory Practices)**
**(All Defendants Other than the Governor and the Acting Commissioner)**

157.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

158.    By their actions, both as state actors and private citizens and enterprises, defendants other than Governor Hochul and McDonald engaged in unlawful discriminatory practices with respect to Mr. Rhodes in violation on NYHRL §296 (a), (d), (e), and (h), including, without limitation, discrimination against Mr. Rhodes based on his actual or perceived age, creed, disability, and national origin.

159.    Defendants also failed to offer Mr. Rhodes any reasonable accommodation and terminated or constructively terminated his employment in violation of the NYHRL §296.10, yet reasonable alternatives existed which would not have unduly burdened defendants' business had they been offered to Mr. Rhodes.

160.    By so acting, defendants have directly and proximately caused the plaintiffs damages, including without limitation, economic damages, and emotional distress damages with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A. Compensatory damages;

B. Punitive damages;

C. Awarding back pay;

D. Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E. Awarding interest as allowed by law;

F. Awarding such other and further relief as may be equitable and just.

## SEVENTH COUNT
### (Rehabilitation Act, 29 U.S.C. § 793 et seq.)
### (All Defendants Other than the Governor and the Acting Commissioner)

161.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

162.    Mr. Rhodes did, in fact, suffer with physical and/or mental disabilities known, or which reasonably should have been known, to defendants, which disabilities substantially limited one or more major life activities and which, in whole or in part, resulted in Mr. Rhodes's receiving three medical exemption letters from qualified licensed medical providers.

163.    Defendants also regarded Mr. Rhodes as disabled, believing that he suffered from an impairment which would, in their view, substantially limit one or more major life activities, based on his refusal of COVID-19 vaccinations.

164.    Defendants, at different times, in different ways, and in different combinations, purposely discriminated against Mr. Rhodes based on his actual and/or perceived disabilities, thus causing him damage.

165.    Alternatively, defendants' failure to reasonably accommodate Mr. Rhodes perceived disabilities violated his rights under the Rehabilitation Act of 1973, and actually or constructively terminated him in violation of the same.

166.    By so acting, defendants have directly and proximately caused the plaintiffs damages, including without limitation, economic damages, and emotional distress damages with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

A.  Compensatory damages;

B.  Punitive damages;

C.  Awarding back pay;

D.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

E.  Awarding interest as allowed by law;

F.  Awarding such other and further relief as may be permitted by statue and/or which otherwise is equitable and just.

## EIGHTH COUNT
### (29 U.S.C. § 623--Age Discrimination in Employment Act)
### (All Defendants Other than the Governor and the Acting Commissioner)

167.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

168.    Mr. Rhodes is in a protected class pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, in that he was over the age of 40 at the time he was separated from his employment and/or otherwise discriminated against in the terms and conditions of his employment.

169.    For the reasons aforesaid, in whole or in part, defendants acted to alter the terms and conditions of Mr. Rhodes' employment and otherwise to discriminate him based on his age.

170.    Mr. Rhodes was constructively actually or constructively discharged from his employment, in whole or in part due to his age, and upon information and belief, has been replaced by one or more people who are younger than Mr. Rhodes to fill the position and roles that Mr. Rhodes was performing.

171.    As a direct and proximate cause of so defendants acting, Mr. Rhodes has suffered By so acting, defendants have directly and proximately caused the plaintiffs damages, including without limitation, economic damages, and emotional distress damages with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

    A. Compensatory damages;

    B. Punitive damages;

    C. Awarding back pay;

    D. Awarding all costs of suit, including reasonable legal fees and expert witness fees;

    E. Awarding interest as allowed by law;

    F. Awarding such other and further relief as may be permitted by statue and/or which otherwise is equitable and just.

<div align="center">

**NINTH COUNT**
**(Intentional Infliction of Emotional Distress)**
**(All Defendants Other than the Governor and the Acting Commissioner)**

</div>

172.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

173.    Defendants acted in an extreme and outrageous manner with respect to Mr. Rhodes with the intent to cause, or disregard of the substantial probability of causing, severe emotional distress.

174.    Mr. Rhodes did actually suffer severe emotional distress which was caused, or which there is a substantial probability of being caused, by defendants' conduct including, without limitation, its actions in imposing and ruthlessly enforcing the vaccine mandate against Mr. Rhodes.

175.    As a direct and proximate cause of so defendants acting, Mr. Rhodes has suffered By so acting, defendants have directly and proximately caused the plaintiffs damages, including without limitation, economic damages, and emotional distress damages with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against defendants other than Governor Hochul and Commissioner McDonald, jointly and severally, as follows:

    A. Compensatory damages;

    B. Punitive damages;

    C. Awarding back pay;

    D. Awarding all costs of suit, including reasonable legal fees and expert witness fees;

    E. Awarding interest as allowed by law;

    F. Awarding such other and further relief as may be permitted by statue and/or which otherwise is equitable and just.

## TENTH COUNT
### (42 U.S.C. §1983 – Establishment of Religion)
### (All Defendants)

176.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

177.    By her actions, as affirmed by her public statements, Governor Hochul acted with the purpose, intent, and effect of establishing a religion which conformed to her personal religious views about the COVID-19 vaccines, which rejected and eschewed the beliefs of all others, including the plaintiff, who failed and refused to adhere to the same.

178.    Governor Hochul acted in her personal capacity by determining that her religious views must be applied throughout the State of New York, and then utilized her official office to do so, which constituted a grave abuse of power with the intent and purpose of discriminating against those whose beliefs were contrary to Governor Hochuls religious beliefs about the COVID-19 vaccines.

179.    In so acting Governor Hochul engaged in the Establishment of Religion in violation of the First and Fourteenth Amendments of the United States Constitution.

180.    Defendants, in enforcing Governor Hochul's religion, also were state actors in such regard and violated the Establishment Clause of the First Amendment of the United States Constitution.

181.    By her actions, Governor Hochul caused irreparable harm to the People of the State of New York, generally, and to Mr. Rhodes specifically, and directly and proximately caused Mr. Rhodes to suffer irreparable harm, pecuniary and non-pecuniary damages, including but not limited to emotional distress with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against all defendants, jointly and severally, as follows:

A. Permanently restraining and enjoining Governor Hochul, and anyone acting under her, including all other defendants, from exercising and/or acting to further enforce any subject New Order, or any future Executive Order which establishes Governor Hochul's personal religious views for the State or any subset thereof;

B. Compensatory damages;

C. Punitive damages;

D. Awarding back pay;

E. Awarding all costs of suit, including reasonable legal fees and expert witness fees;

F. Awarding interest as allowed by law;

G. Awarding such other and further relief as may be equitable and just.

### ELEVENTH COUNT
**(42 U.S.C. §1983 – Free Exercise)**
**(All Defendants)**

182.    Mr. Rhodes repeats and reasserts each and every allegation above as if fully set forth herein at length.

183.    By virtue of her act of establishing a religion, as aforesaid, Governor Hochul and all those who aided in the enforcement of the same, including all defendants, precluded the free exercise of religion of all those who wished not to practice such religion, but rather wished to practice a different faith or engage in differing consciousness than such established religion, in violation of the Free Exercise Clause.

184.    By acting as agents in enforcing Governor Hochul's religion and refusing to provide exemption for those with religious exemptions by terminating Mr. Rhodes, all other defendants aided and are responsible as state actors for depriving Mr. Rhodes of her rights to freely exercise her religion in violation of the First and Fourteenth Amendment of the Constitution.

185.    By her actions, Governor Hochul caused irreparable harm to the People of the State of New York, generally, and to the plaintiff specifically, and directly and proximately caused Mr. Rhodes to suffer irreparable harm, pecuniary and non-pecuniary damages, including but not limited to emotional distress with physical manifestation.

**WHEREFORE** Mr. Rhodes demands judgment against all defendants, jointly and severally, as follows:

A.  Permanently restraining and enjoining Governor Hochul, and anyone acting under her, including McDonald, from exercising and/or acting to further enforce any subject New Order, or any future Executive Order which establishes Governor Hochul's personal religious views for the State or any subset thereof;

B.  Compensatory damages;

C.  Punitive damages;

D.  Awarding back pay;

E.  Awarding all costs of suit, including reasonable legal fees and expert witness fees;

F.  Awarding interest as allowed by law;

G. Awarding such other and further relief as may be equitable and just.

## JURY DEMAND

Trial by jury is demanded on all Counts so triable.

Dated: New York, New York
      July 26, 2023

<div style="margin-left:40%">

**MURRAY-NOLAN BERUTTI LLC**
Attorneys for Plaintiff

*s/ Ronald A. Berutti*

By:_____
    Ronald A. Berutti, Esq.
    30 Wall Street, 8th Floor
    New York, New York 10005
    (212) 575-8500
    ron@murray-nolanberutti.com

</div>

## VERIFICATION

**EVAN RHODES,** of full age, declares the following under penalty of perjury:

1. I am the plaintiff herein and am fully familiar with the facts and circumstances herein;

2. I have reviewed the Complaint and know its contents to be true, except as to the matters stated on information and belief, which I believe to be true.

*Evan Rhodes*

Evan Rhodes

Dated: July 26 , 2023